[No. C066319. Third Dist. July 13, 2012.]

In re O.P., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
O.P., Defendant and Appellant.

## COUNSEL

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RAYE, P. J.**—A prosecutor charged 13-year-old O.P., who is mildly mentally retarded,[1] with assault with a deadly weapon; a court found he was not competent to stand trial, and pursuant to a challenged special instruction, the jury may have found him dangerous solely because he is an incompetent defendant charged with a violent felony. He contends the special instruction renders his civil commitment unconstitutional. (Welf. & Inst. Code, § 6500.)[2] We agree.

---

[1] We are aware of recent public efforts to use substitute terminology for mental retardation. We, however, will use the terminology set forth in the applicable statute.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise designated.

# I

## MOOTNESS

Following an 11-day jury trial, the court committed O.P. to Porterville Developmental Center (Porterville) and set a recommitment hearing for September 27, 2011. Since O.P.'s appeal will be decided beyond his commitment period, his appeal is technically moot. (*People v. Bailie* (2006) 144 Cal.App.4th 841, 844, fn. 2 [50 Cal.Rptr.3d 761] (*Bailie*).) He has either been released from Porterville or he has been recommitted on new facts. As a result, the facts of the underlying case are, for the most part, irrelevant.

Nevertheless, "courts have decided such appeals where the issues are recurring and present important questions of law. [Citation.]" (*Bailie, supra,* 144 Cal.App.4th at p. 844, fn. 2.) This case presents an important question of law that may evade appellate review. That question alone therefore circumscribes the scope of our review. Whereas at trial the focus was whether O.P.'s mental retardation was a substantial factor in causing him serious difficulty controlling his dangerous behavior, the sole focus on appeal is whether he was deprived of due process by the special instruction allowing the jury to find him dangerous based only on the fact he was declared incompetent and had been charged with, not tried for or convicted of, a violent felony.

There was an abundance of evidence that O.P. had multiple disorders unrelated to his mild mental retardation. Indeed, the court-appointed psychologist did not diagnose him with mild mental retardation until 2010. But no one disputes he had a history of violent outbursts. One doctor opined O.P. suffered from posttraumatic stress syndrome resulting from the violence he observed and was subjected to by his parents, who separated and got back together multiple times. There were numerous reports to child protective services, many restraining orders, and police reports suggesting a turbulent and dysfunctional family. O.P. repeatedly expressed fear of his father. Two psychologists and a physician testified that O.P. suffered from depression, intermittent explosive disorder, seizure disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder.

But the facts underlying the original commitment, as well as an evaluation of harmlessness, are moot. We will not recite or evaluate the additional evidence that O.P. was a danger to himself or others because the challenged instruction allowed the jurors to ignore that evidence in determining O.P. was dangerous, and indeed, the prosecutor encouraged them to do so. Nor will we consider evidence, as the Attorney General urges, to support a finding that the instruction was harmless. As the court held in *People v. Sweeney* (2009) 175 Cal.App.4th 210, 225 [95 Cal.Rptr.3d 557] (*Sweeney*), "We decline to

determine whether the trial court's error was harmless, because the order of commitment is moot. We have chosen to address the issues raised by Sweeney because they involve matters of public interest that are likely to reoccur yet normally evade review; however, there would be little value in a harmless error analysis." Thus we proceed to the narrow, but important, question before us.

## II

## DUE PROCESS

■ The prosecution had the burden to prove beyond a reasonable doubt that O.P. was mentally retarded, a danger to himself or others, and that his mental retardation was a substantial factor in causing him serious difficulty controlling his dangerous behavior. (*Bailie, supra*, 144 Cal.App.4th 841.) The special instruction explained the criteria for assessing the second element—whether O.P. was dangerous.

Special instruction No. 5 is the target of O.P.'s constitutional challenge. Special instruction No. 5 states:

"The Respondent is a danger to himself or others when:

"1. There has been a finding of incompetence to stand trial on the charged offense

"AND

"Respondent is charged with a felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person

"OR

"2. Respondent is a present danger to himself or others."

O.P. contends that instructing the jury it could find him "dangerous" based on the fact that he was deemed incompetent and charged with a violent felony violated the due process and equal protection clauses of the United States Constitution. We conclude his due process challenge has merit and do not consider his equal protection argument.

■ As a proposition so close to the heart of a free people's commitment to liberty, it hardly needs repeating that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process

protection." (*Addington v. Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804].) Over time, the United States Supreme Court has fine-tuned our notion of due process " 'to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' " (*In re Howard N.* (2005) 35 Cal.4th 117, 128 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), quoting *Kansas v. Hendricks* (1997) 521 U.S. 346, 358 [138 L.Ed.2d 501, 117 S.Ct. 2072]; see *Kansas v. Crane* (2002) 534 U.S. 407, 412–413 [151 L.Ed.2d 856, 122 S.Ct. 867]; *Hendricks, supra*, 521 U.S. at p. 357; *Heller v. Doe* (1993) 509 U.S. 312, 314–315 [125 L.Ed.2d 257, 113 S.Ct. 2637].)

■ California courts have been out in front of the Legislature in assuring that persons facing civil commitment under a variety of statutory schemes are afforded due process. In five poignant examples, the courts implied or inferred a due process requirement to salvage a statute from an otherwise meritorious constitutional challenge. Each case stands as a sobering reminder that criminal law is fundamentally designed to deal with dangerous persons who breach the social contract, and it is only in extreme and limited cases that civil commitment can be justified to intercede and remove a person deemed dangerous. "[I]f individuals could be civilly confined as dangerous without *any* disorder-related difficulty in controlling their dangerous behavior, there would be no adequate distinction from the general run of dangerous persons who are subject exclusively to the criminal law." (*People v. Williams* (2003) 31 Cal.4th 757, 772 [3 Cal.Rptr.3d 684, 74 P.3d 779].) In short, "due process *requires* an inability to control dangerous conduct . . . ." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1158 [81 Cal.Rptr.2d 492, 969 P.2d 584].)

In *Conservatorship of Hofferber* (1980) 28 Cal.3d 161 [167 Cal.Rptr. 854, 616 P.2d 836] (*Hofferber*), the Supreme Court preserved the constitutionality of civil commitment statutes even though the relevant statutes did "not expressly require a showing of continuing dangerousness," but appeared "to permit indefinite maintenance of LPS [(Lanterman-Petris-Short Act; § 5000 et seq.)] conservatorships solely because the incompetence continues and the violent felony charges have not been dismissed." (*Hofferber*, at pp. 174–175.) In *Hofferber*, an individual could be found " 'gravely disabled' " based only on a showing that he was charged with a violent felony and was incompetent to assist in his defense because of a mental disorder. (*Id.* at p. 170.) The court construed the statute to require a finding that an incompetent defendant remained currently and violently dangerous. (*Id.* at pp. 175, 176–178.)

In *People v. Alvas* (1990) 221 Cal.App.3d 1459 [271 Cal.Rptr. 131] (*Alvas*), we too found that a statute's failure to define "dangerousness" for all people within its scope was not fatal to its constitutionality. We explained:

"Both the LPS Act and section 6500 et seq. have been enacted for the obvious purpose of protecting and treating those who due to various mental deficiencies pose a danger to themselves or others. [Citation.] Section 5300 of the LPS Act equates 'danger' to the potential for 'infliction of substantial physical harm.' [Citations.] Given the similarity of purpose behind the LPS Act and section 6500 proceedings, there is simply no reason to ascribe different meanings to the same term. Therefore we conclude that insofar as 'dangerousness' is not defined in section 6500, it should be construed to mean the potential for infliction of substantial harm upon the defendant himself or upon others." (*Alvas*, at p. 1467.)

Section 1800 et seq. provide for the civil detention of juveniles beyond a commitment to the Department of Corrections and Rehabilitation, Division of Juvenile Justice. The Supreme Court in *Howard N., supra*, 35 Cal.4th 117 considered whether such an extended detention scheme violates due process "because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior." (*Id.* at p. 122.) Following an exhaustive analysis of the United States Supreme Court jurisprudence on due process principles regarding civil commitment, the California Supreme Court concluded an extended detention scheme must contain a requirement that the individual has serious difficulty in controlling dangerous behavior. (*Id.* at p. 132.)

The court acknowledged that the statute did not contain the express requirement necessary to render it constitutional. Nevertheless, the court construed it in such a way as to save it. "While the statutory language does not expressly require a demonstration that the person has serious difficulty controlling his dangerous behavior, construing the existing language to include such a requirement does not appear inconsistent with legislative intent. Rather, implicit in the statutory language linking dangerousness to a 'mental . . . deficiency, disorder, or abnormality' is a certain legislative understanding that a person afflicted with such a condition may lack a degree of responsibility or control over his actions. In construing the language to include a requirement of serious difficulty in controlling dangerous behavior, we therefore do no violence to the words of the statute; rather the words are susceptible of that interpretation." (*Howard N., supra*, 35 Cal.4th at pp. 132–133.)

Relying on *Howard N.*, Alexander Bailie argued that section 6500 violated due process because it did not require proof that an individual's mental retardation caused him to have serious difficulty in controlling dangerous behavior. We agreed in *Bailie, supra*, 144 Cal.App.4th 841. Following the Supreme Court's lead in *Howard N.*, we concluded "the Legislature would prefer to construe the section 6500 scheme as including a requirement of

serious difficulty in controlling dangerous behavior, rather than invalidate the scheme in its entirety." (*Bailie*, at p. 850.)

*Sweeney, supra*, 175 Cal.App.4th 210 applied the logic of both *Howard N.* and *Bailie* and concluded "the trial court erred by failing to instruct the jury that, in order to find Sweeney met the criteria of section 6500, it must have found Sweeney's mental retardation was a substantial factor in causing her serious difficulty in controlling her dangerous behavior." (*Sweeney*, at p. 225.) The court also held Sweeney had been denied due process because the judge, not the jury, determined that two of the felony charges pending against her involved " 'death, great bodily injury, or an act which poses a serious threat of bodily harm to another person.' " (*Ibid.*, quoting § 6500.)

At first blush it would appear the trial court provided O.P. the due process *Sweeney* compels. In deference to *Sweeney* and its predecessors, the trial court gave special instruction No. 1 to the jury:

"The Petitioner has the burden of proving beyond a reasonable doubt that:

"1. The Respondent is mentally retarded; AND

"2. The Respondent is a danger to himself or others; AND

"3. The Respondent's mental retardation is a substantial factor in causing him serious difficulty controlling his dangerous behavior."

But *Sweeney* does not address the specific due process challenge now before us. O.P. does not challenge special instruction No. 1, which does embody the elements of due process delineated in *Howard N., Bailie*, and *Sweeney*. Rather, he challenges special instruction No. 5, wherein the second element of dangerousness was further explained.

As described above, special instruction No. 5 gave the jurors the option to find O.P. dangerous based solely on a finding that he had been adjudged incompetent to stand trial and charged with a felony "involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." Thus, in O.P.'s view, the instruction allowed the jury to commit him without finding he was currently dangerous. Moreover, he insists that reliance on pending charges alone is an overt and egregious deprivation of due process.

The risk of a wrongful commitment is particularly insidious given the public misconceptions about mental retardation and mental illness. One expert psychologist testified there is no correlation between mental retardation and dangerousness. In fact, Dr. Jeffrey Miller testified that a person with mental retardation is more likely to be a victim than a perpetrator of violence, and is often likely to withdraw when threatened or under stress. Evidence that a defendant is incompetent to stand trial by virtue of his mental retardation and is charged with a violent felony does not prove the defendant is dangerous to himself or others. Yet due process demands proof of current dangerousness, linked to the defendant's mental retardation. Insofar as it permits a finding of current dangerousness based on a mere allegation that a mentally retarded person has committed a violent felony, special instruction No. 5 violates due process.

The instruction also jumbles the correct statements of law set forth in special instruction No. 1, as illustrated by the jury's manifest confusion in considering the necessary link between mental retardation and dangerousness. Having been instructed that O.P.'s mental retardation must be "a substantial factor in causing him serious difficulty controlling his dangerous behavior," the jury inquired: "Can you please define 'substantial' using different terms than these in the packet? Does 'substantial' mean bigger or more; or more important?"

The jury's question is particularly troubling in light of the challenged instruction, which improperly permitted a finding of dangerousness based merely on O.P.'s incompetence and the violent felony charge against him. O.P.'s mental retardation, the basis for his incompetence and one of the elements making him dangerous, under the instruction would also be a substantial factor in causing him serious difficulty controlling his dangerous behavior. Thus, through a process of circular reasoning completely detached from the stringent due process requirements set forth above, O.P.'s mental retardation could have been the basis for a finding of incompetence, and that finding, coupled with the mere charge that he committed a felony, would justify a civil commitment. In short, O.P. was denied due process where, as here, the jury was allowed to commit him without a proper finding that he was currently dangerous.

That is not to say that the conduct upon which the criminal charges are based is not relevant in the civil commitment proceedings. Here, evidence that O.P. stabbed his father, combined with other recent examples of his propensity for violence, may support his need for commitment to a stable and secure environment. But the charge alone does not prove he is dangerous. Even a rudimentary sense of due process would provide O.P. the opportunity to present a defense. The record is littered with evidence of domestic

violence. O.P.'s mother obtained restraining orders against his father to protect the children. She testified to her fear of him. O.P. had reported his fear of his father to school authorities as well as the psychologist and doctors at Porterville. Yet the special instruction did not require the jury to consider any evidence of self-defense or mitigating circumstances that, when put into context, might have suggested O.P. was not dangerous.

The vice in the instruction is that, as O.P. contends, the mere filing of charges against a person with mental retardation who is, not surprisingly, found incompetent satisfies the requirement that the mentally retarded person is dangerous. There is certainly nothing in the expert testimony offered in this case to support the notion that the mentally retarded have a propensity for violence, let alone that they are, by virtue of a prosecutor's allegations, currently dangerous. In both *Bailie* and *Sweeney*, the Courts of Appeal found that due process demands proof of mental retardation, dangerousness, and the requisite link between the two. In the absence of a finding based on suitable evidence that O.P. was currently dangerous, the commitment violates his fundamental right to due process. Special instruction No. 5 is therefore fatally flawed and cannot be used in future hearings.

The instruction tracked the language of section 6500. The bigger, and more important, question is whether section 6500 is subject to the same due process infirmity or whether we, like the courts in the cases discussed above, can and should construe the statute in a manner to preserve its constitutionality. Section 6500 provides, in pertinent part: "On and after July 1, 1971, no mentally retarded person may be committed to the State Department of Developmental Services pursuant to this article, unless he or she is a danger to himself or herself, or others. For the purposes of this article, dangerousness to self or others shall be considered to include, but not be limited to, a finding of incompetence to stand trial pursuant to the provisions of Chapter 6 (commencing with Section 1367) of Title 10 of Part 2 of the Penal Code when the defendant has been charged with murder, mayhem, aggravated mayhem, a violation of Section 207, 209, or 209.5 of the Penal Code in which the victim suffers intentionally inflicted great bodily injury, robbery perpetrated by torture or by a person armed with a dangerous or deadly weapon or in which the victim suffers great bodily injury, carjacking perpetrated by torture or by a person armed with a dangerous or deadly weapon or in which the victim suffers great bodily injury, a violation of subdivision (b) of Section 451 of the Penal Code, a violation of paragraph (1) or (2) of subdivision (a) of Section 262 or paragraph (2) or (3) of subdivision (a) of Section 261 of the Penal Code, a violation of Section 288 of the Penal Code, any of the following acts when committed by force, violence, duress,

menace, fear of immediate and unlawful bodily injury on the victim or another person: a violation of paragraph (1) or (2) of subdivision (a) of Section 262 of the Penal Code, a violation of Section 264.1, 286, or 288a of the Penal Code, or a violation of subdivision (a) of Section 289 of the Penal Code; a violation of Section 459 of the Penal Code in the first degree, assault with intent to commit murder, a violation of Section 220 of the Penal Code in which the victim suffers great bodily injury, a violation of Section 18725, 18740, 18745, 18750, or 18755 of the Penal Code, or if the defendant has been charged with a felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person."

On its face, section 6500 does not set forth the due process requirements compelled by *Bailie* and *Sweeney*. But for the courts' ongoing willingness to liberally construe the terms of the statute to include basic notions of due process, the statute would not have passed constitutional muster. Applying the logic of *Howard N.*, the courts in *Bailie* and *Sweeney*, however, state with some precision that due process demands that before a mentally retarded person can be civilly committed, a jury must unanimously find that he or she is currently dangerous and that the mental retardation is a substantial factor in causing serious difficulty in controlling dangerous behavior. Rather than declaring the statute unconstitutional, the courts simply inferred what the legislators neglected to say.

■ We will do the same. The statute, on its face, offends due process. According to its express terms, any mentally retarded person incompetent to stand trial can be found dangerous and be committed simply if charged with a violent felony. To avoid the constitutional infirmity described above, we will do as the courts in *Hofferber*, *Alvas*, *Howard N.*, *Bailie*, and *Sweeney* have done before us and construe the statute to require evidence and not a mere allegation of dangerousness. We hold, therefore, that the statute implicitly includes a requirement that a mentally retarded person can only be found a danger to himself or others based on evidence of current dangerousness and not merely a prosecutor's allegation that an incompetent person committed a violent felony.

■ Special instruction No. 5 did not embody this essential requirement. In future commitment proceedings, the jury must be instructed in language that embodies these essential due process requirements. No mentally retarded person incompetent to stand trial in the State of California will be at risk of a civil commitment based solely on the filing of charges against him or her. Due process will tolerate nothing less than a finding of actual and current dangerousness, and the pivotal link between the mental retardation and a serious difficulty in controlling dangerous behavior.

## DISPOSITION

For the foregoing reasons, we conclude section 6500 requires a finding of current dangerousness based on evidence beyond the charges filed against a defendant and the defendant's incompetence to stand trial. Because special instruction No. 5 does not comport with this requirement, the commitment order was in error.

Nicholson, J., and Mauro, J., concurred.