[No. E043410. Fourth Dist., Div. Two. June 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ANNETTE SWEENEY, Defendant and Appellant.

COUNSEL

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Angela M. Borzachillo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MILLER, J.—Defendant Annette Sweeney (Sweeney) appeals from an order committing her to Porterville State Hospital pursuant to Welfare and Institutions Code section 6500.[1] Sweeney was committed for the statutory period of one year after a jury found that she was mentally retarded and dangerous. (§ 6500.) Sweeney makes four contentions: (1) the trial court violated her rights to due process and equal protection; (2) the trial court violated her right to confront witnesses against her; (3) the trial court improperly instructed the jury; and (4) the trial court denied her a fair placement hearing by denying her request for a continuance. We agree that the trial court violated Sweeney's due process rights and that the trial court improperly instructed the jury. We disagree with Sweeney's contentions regarding equal protection and confrontation. We do not address Sweeney's argument concerning her request for a continuance.

We note that the maximum one-year period of confinement has expired. (§ 6500.) Therefore, this case is technically moot. We have not been asked to dismiss the appeal on these grounds. The issues addressed in this appeal are of continuing public importance, and such orders will typically expire before an appeal can be heard and thus will evade review. Therefore, we will address the issues presented by Sweeney; however, we dismiss the appeal as moot.[2] (See *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 708–709, 713 [79 Cal.Rptr.3d 530].)

FACTUAL AND PROCEDURAL HISTORY

On April 2, 2003, the Riverside County District Attorney filed a complaint against Sweeney. The complaint alleged that on or about March 31, 2003,

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] Our conclusions that the appeal is moot and should be dismissed are strictly limited to the facts presented in this case. We do not intend these conclusions to be applied in all civil commitment cases.

Sweeney (1) willfully and unlawfully used force and violence and inflicted injury upon a peace officer (Pen. Code, § 243, subd. (c)(2)); (2) willfully and unlawfully attempted by means of threats and violence to deter and prevent an executive officer from performing his duties (Pen. Code, § 69); and (3) willfully and unlawfully threw a hubcap at a vehicle on a highway (Veh. Code, § 23110, subd. (a)).

On June 20, 2003, the trial court found Sweeney incompetent to stand trial (Pen. Code, § 1368), and the criminal proceedings against her were suspended (Pen. Code, § 1370.1, subd. (a)(1)(B)). Sweeney was committed to Porterville State Hospital for a maximum period of three years eight months.

On October 25, 2006, the district attorney filed a petition requesting that Sweeney be committed to the State Department of Developmental Services. (§ 6500.) The district attorney alleged that Sweeney was mentally retarded and a danger to herself or others. (*Ibid.*) On April 23, 2007, a jury found that Sweeney was mentally retarded and dangerous. (*Ibid.*) The court found Sweeney should continue to be housed at Porterville State Hospital.

## DISCUSSION

### A.  *Due Process and Equal Protection*

#### 1.  *Background*

█  Section 6500 authorizes a mentally retarded person to be committed to the State Department of Developmental Services if "he or she is a danger to himself or herself, or others." The definition of "dangerousness to self or others" includes, but is not limited to, "a finding of incompetence to stand trial . . . if the defendant has been charged with a felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." (§ 6500.)

During pretrial motions, the district attorney argued that Sweeney met the definition of dangerous because she had been found incompetent to stand trial, and she had been charged with two felonies that involved great bodily injury or an act which posed a serious threat of bodily harm to another person. Sweeney's trial attorney argued that the jury should determine whether the charges against Sweeney involved "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." (§ 6500.) The district attorney asserted that such a determination involved a question of law, not fact, and therefore the court should decide whether the charges against Sweeney involved violence or a threat of violence. The district attorney contended two charges, (1) willfully and unlawfully using

force and violence and inflicting injury upon a peace officer (Pen. Code, § 243, subd. (c)(2)), and (2) willfully and unlawfully attempting by means of threats and violence to deter and prevent an executive officer from performing his duties (Pen. Code, § 69), qualified as charges involving great bodily injury, or a serious threat of bodily harm.

The trial court concluded that the determination of whether a charge involved violence or a threat of violence is a question of law. The court concluded that the Penal Code section 243, subdivision (c)(2), charge and the Penal Code section 69 charge met the offense criteria of Welfare and Institutions Code section 6500.

At the hearing on the petition, the district attorney presented the jury with evidence of Sweeney's dangerous behavior, and argued that Sweeney was a danger to herself and to others.

2. *Discussion*

(a) *Due Process*

In an argument that is entwined with her equal protection contention, Sweeney asserts that her due process rights were violated when the trial court determined that the charges pending against her involved "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." (§ 6500.) We agree with Sweeney.

In order to commit a person pursuant to section 6500, it must be proven that the person (1) is mentally retarded; (2) is dangerous to himself or others; and (3) has serious difficulty controlling his dangerous behavior because of his mental retardation.[3] A person can be considered "dangerous to himself or others" if the person was found mentally incompetent to stand trial on felony charges that involve "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." Accordingly, Sweeney's argument is focused on the element of "dangerous to himself or others," and more specifically on the portion of the definition of dangerous that addresses the predicate offense. The essential question posed by Sweeney's argument is: Does the court or jury decide if the predicate offense charge involves "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person"? (§ 6500.)

The principles governing the resolution of this issue are discussed in *People v. Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680]

---

[3] This third element is not in the language of the statute; however, as we will discuss *post*, under Sweeney's jury instruction contention, the statute must be construed as including this element.

(*Figueroa*), and *People v. Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*).[4] In *Figueroa*, the defendant was convicted of selling unqualified securities, in violation of Corporations Code section 25110. (*Figueroa*, at p. 718.) Our Supreme Court concluded that the trial court erred by instructing the jury that certain "Corporation Promissory Notes" were "securities" within the meaning of the law, because the trial court improperly removed an element of the crime from the jury's consideration. (*Id.* at p. 734.) The Supreme Court observed that cases which held that the question of what constitutes a security is a question of law, reserved for the trial court, could not withstand scrutiny "under more modern concepts of due process and the right to a jury trial." (*Id.* at p. 731.) The court concluded that due process required the jury, not the court, to find every element of the offense. (*Id.* at pp. 732–733.)

In *Hedgecock*, the court explained: "*Figueroa* did not abrogate the question-of-law/question-of-fact distinction in determining whether issues should be submitted to the jury. It did suggest, however, that this distinction plays a relatively limited role in view of a defendant's constitutional right to have a jury determine the existence of all elements of the offense charged." (*Hedgecock, supra*, 51 Cal.3d at p. 407.) Thus, the critical question here is: Is the violent or assaultive nature of the felony charge an element that must be proven in section 6500 commitment proceedings? (See *Hedgecock*, at p. 407.) If it is an element, then "it matters not whether the issue in question is one of fact or law. Due process requires that it be submitted to the jury." (*People v. Wilkins* (1993) 14 Cal.App.4th 761, 778 [17 Cal.Rptr.2d 743].)

■ Being "a danger to himself or herself or to others" is an element of section 6500. The definition of "dangerousness to self or others," in section 6500, includes (1) being charged with a violent or assaultive felony, and (2) being found incompetent to stand trial on that felony charge. Accordingly, to the extent a petitioner relies on this definition in proving the element of "dangerousness to self or others," the violent or assaultive nature of the felony constitutes a sub-element of section 6500. In other words, if a trial court were to conclude that a felony charge involves "death, great bodily injury, or an act which poses a serious threat of bodily harm to another

---

[4] Although we rely on a variety of criminal cases in our due process and equal protection discussions, we recognize the inherent differences between civil commitment proceedings and criminal proceedings, specifically, statutory due process versus constitutional due process. (See *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 386 [178 Cal.Rptr. 69] [discussing the application of criminal due process standards in § 6500 proceedings]; see also *Addington v. Texas* (1979) 441 U.S. 418, 430–431 [60 L.Ed.2d 323, 99 S.Ct. 1804] [same]; *Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 735 [49 Cal.Rptr.3d 511] [distinguishing due process for civil commitment and criminal proceedings]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224–235 [152 Cal.Rptr. 425, 590 P.2d 1] [relying on both criminal and civil precedent].)

person" then the only issue left for the jury to determine on the issue of dangerousness is whether the defendant was found incompetent to stand trial on that charge. In effect, the trial court would be determining one portion of the element of dangerousness, which is problematic because no element of the verdict, even an undisputed element, may be determined by the judge. (*Figueroa, supra*, 41 Cal.3d at pp. 724, 733.)

A judge's duty is to instruct the jury on the definition of "dangerousness to self or others," and then allow the jury to determine if the defendant meets the criteria. (See *Figueroa, supra*, 41 Cal.3d at pp. 733–734.) For example, part of the definition of " 'Sexually violent predator' " (SVP) is that the person "has been convicted of a sexually violent offense." (§ 6600, subd. (a)(1).) The jury instruction for SVP commitment proceedings requires the jury to determine if the person "has been convicted of committing sexually violent offenses against one or more victims." (CALCRIM No. 3454.) In section 6500 proceedings, if the petitioner relies on the definition of dangerousness that entails a finding of incompetence to stand trial on a felony charge that involves violent or assaultive behavior, then the jury should be instructed to determine if the person "has been charged with a felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." (§ 6500.)

In sum, we conclude the trial court erred when it decided that two of the felony charges pending against Sweeney involved "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person" (§ 6500), because that is a determination that should be made by a jury. We decline to determine whether the trial court's error was harmless, because we will dismiss the appeal as moot.

In Sweeney's argument she contends that the jury's determination of whether the felony charges pending against her involved violent or assaultive behavior should have occurred in "a kind of *prima facie* hearing." It is unclear why Sweeney is asserting that the jury's determination should be made in a pretrial hearing, rather than during the commitment hearing. We conclude that the determination should be made by the jury during the commitment hearing, since it is part of the element of dangerousness, which must be found by the jury at the commitment proceeding.

(b) *Equal Protection*

Sweeney contends that section 6500 violates equal protection principles because mentally retarded people are treated differently than mentally ill people. The specific disparity complained of by Sweeney is that mentally ill people can have a jury determine the facts of the predicate offenses listed in

their commitment petitions at jury trials; however, incompetent mentally retarded people are not afforded jury hearings regarding their predicate offenses.

We assume Sweeney would concede that section 6500 does not violate equal protection, now that we have concluded that due process requires a jury to determine whether the felony offense listed in the commitment petition involves "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." Nevertheless, to the extent Sweeney is arguing that mentally retarded people are treated differently than the mentally ill, because mentally ill people receive a jury determination on their predicate offense *prior* to their commitment proceedings, we disagree.

■ "To demonstrate a denial of equal protection, it must first be shown that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.]" (*People v. Goslar* (1999) 70 Cal.App.4th 270, 276 [82 Cal.Rptr.2d 558].)

"If it is determined that the law treats similarly situated groups differently, a second level of analysis is required. If the law in question impinges on the exercise of a fundamental right, it is subject to strict scrutiny and will be upheld only if it is necessary to further a compelling state interest." (*People v. Goslar, supra*, 70 Cal.App.4th at p. 277.)

■ Sweeney was not given a jury determination regarding her predicate felony offenses prior to her commitment proceedings because she was found incompetent. (Pen. Code, § 1367.) Accordingly, when determining whether section 6500 violates equal protection for purposes of civilly committing people who were not given a jury determination regarding their predicate offenses, we must compare mentally retarded people who have been found incompetent, with mentally ill people who have been found incompetent, because those groups are similarly situated. (See *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 172 [167 Cal.Rptr. 854, 616 P.2d 836] [mentally ill people "against whom a judicial determination of criminal conduct has been made" are classified separately from those "not adjudicated under the criminal justice system"]; see also *In re Banks* (1979) 88 Cal.App.3d 864, 871 [152 Cal.Rptr. 111] [separating mentally ill people who have been convicted from mentally ill people who are incompetent].)

Next, we determine if the two groups are treated differently. First we examine the commitment procedures for incompetent mentally ill defendants. When a person is found to be mentally incompetent, then the criminal proceedings against that person must be suspended. (Pen. Code, §§ 1367, 1368.) When the proceedings are suspended, the person cannot be tried or

convicted, and the person may be committed for a maximum of three years. (Pen. Code, §§ 1368, subd. (a), 1370, subd. (c)(1).) After the commitment period has expired, if the defendant appears to be "gravely disabled" then conservatorship proceedings must be initiated. (Pen. Code, § 1370, subd. (c)(2).) "[G]ravely disabled" means (1) the defendant has been found mentally incompetent; (2) the defendant has a felony information or indictment pending against him that alleges an offense involving "death, great bodily harm, or a serious threat to the physical well-being of another person"; and (3) as a result of a mental disorder, the defendant is unable to understand the nature and purpose of the proceedings against him. (Welf. & Inst. Code, § 5008, subd. (h)(1)(B); see Pen. Code, § 1370, subd. (c)(2).) If a person is found to meet this definition of gravely disabled, then the person may be placed in a state hospital or other state-licensed facility. (Welf. & Inst. Code, § 5358, subd. (a)(1)(B).)

In the foregoing statutory scheme, a gravely disabled person is not given a jury determination regarding his predicate offense prior to the conservatorship proceedings that will lead to the person being housed in a state facility, because the person has been found incompetent and the criminal proceedings were suspended. (Pen. Code, §§ 1367, 1368.) Mentally retarded people who have been found incompetent are treated similarly.

Section 6500 provides that if a jury determines a person is a danger and is mentally retarded, then the person may be committed to the State Department of Developmental Services for one year. (§ 6500.) In this statute, mentally retarded people, who are incompetent, are not given a jury hearing regarding their predicate offenses prior to their commitment proceedings because of their incompetence, which is the same as gravely disabled people who do not receive a jury hearing prior to conservatorship proceedings, which will lead to them being housed in a state facility. (See *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1015 [36 Cal.Rptr.2d 40, 884 P.2d 988] [conservatorship proceedings and commitment proceedings are similar].) Consequently, we conclude there is no disparate treatment between the two groups. Due to our conclusion that the groups are not treated differently, we do not reach the strict scrutiny analysis. (See *In re Smith* (2008) 42 Cal.4th 1251, 1263 [73 Cal.Rptr.3d 469, 178 P.3d 446] [strict scrutiny is applied to equal protection claims involving civil commitment proceedings].)

■ In both her opening and reply briefs, Sweeney essentially argues that mentally retarded people are similarly situated to people subject to commitment in SVP proceedings (Welf. & Inst. Code, § 6601), mentally disordered offender (MDO) proceedings (Pen. Code, § 2962), and not guilty by reason of insanity (NGI) proceedings (Pen. Code, § 1026), and that mentally retarded people are treated differently because they are not given a jury determination

regarding their predicate offenses. SVP, MDO, and NGI commitment proceedings all follow convictions at criminal trials because the defendants were competent to stand trial. (Welf. & Inst. Code, § 6601, subd. (a)(1) [SVP]; Pen. Code, § 2962, subd. (a) [MDO]; Pen. Code, § 1026, subd. (a) [NGI].)

In *In re Banks* this court noted that people who have been found to be incompetent are not similarly situated to people who have been found guilty of criminal acts. (*In re Banks, supra,* 88 Cal.App.3d at p. 871.) Accordingly, Sweeney's argument that incompetent people who are subject to section 6500 should be given a pretrial hearing similar to the criminal trials that precede SVP, MDO, and NGI commitment proceedings only achieves a specious viability. The proper comparison is between criminally charged mentally ill people who are incompetent to stand trial, and criminally charged mentally retarded people who are incompetent to stand trial, which is set forth in the foregoing analysis.

### B. *Confrontation*

Sweeney essentially contends the trial court erred (1) during pretrial motions, by relying on hearsay statements in determining whether Sweeney's behavior was violent or assaultive, and (2) during the jury trial, by allowing Dr. McWilliams to testify regarding information contained in police reports. Sweeney contends the court erred because the issue of whether Sweeney's conduct posed a serious threat of bodily injury "is at least quasi-criminal in nature and . . . requires criminal law procedures," therefore, Sweeney argues, admission of the hearsay statements violated her right to confrontation. Sweeney relies on *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*) in making this assertion.

The California Supreme Court has held that appellate courts should generally apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to confrontation. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 [30 Cal.Rptr.3d 493, 114 P.3d 742] [concluding that "independent review" applies because "the ruling we are reviewing affects the constitutional right of confrontation"].) Accordingly, we apply the de novo standard of review to Sweeney's claim that the trial court violated her constitutional right to confrontation.

■ As noted in *Crawford*, the Sixth Amendment's confrontation clause applies in criminal proceedings. (*Crawford, supra,* 541 U.S. at p. 42.) Proceedings pursuant to section 6500 are civil commitment proceedings and are "not analogous to criminal proceedings." (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793].) This court concluded in *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1368 [30 Cal.Rptr.3d 189], that " 'the confrontation clause does not apply to civil commitment proceedings.' " Consequently, Sweeney's attempt to parse one element from section

6500 and define that one element as criminal or quasi-criminal is unconvincing, in light of the foregoing precedent, because section 6500 proceedings are classified as civil commitment proceedings, and the confrontation clause is not applicable to such proceedings.

■ Moreover, our Supreme Court has held, "The sole state interest [in section 6500 proceedings], legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose." (*Cramer v. Tyars, supra,* 23 Cal.3d at p. 137.) Accordingly, we do not see a criminal purpose behind this statute or a criminal purpose behind the one element singled out by Sweeney.

In sum, we disagree with Sweeney's contention that the confrontation clause is applicable to the issue of whether her conduct fit the criteria of "conduct posing a serious threat of bodily injury."

### C. *Jury Instruction*

Sweeney contends the trial court erred when it failed to instruct the jury that, in order to conclude Sweeney met the criteria of section 6500, the jury must find that Sweeney's mental retardation was a substantial factor in causing her serious difficulty in controlling her dangerous behavior.[5,6] Essentially, Sweeney contends reversal is required because the court's instructions omitted the element of causation. Sweeney relies on *People v. Bailie* (2006)

---

[5] At oral argument, both parties agreed the instruction should include the language "substantial factor." The SVP jury instruction also includes the term "substantial." The jury instruction for SVP proceedings requires the People prove that "[a]s a result of that diagnosed mental disorder, [the SVP] is a danger to the health and safety of others because it is likely that [he] will engage in sexually violent predatory criminal behavior." (CALCRIM No. 3454.) The instruction defines the phrase "*likely to engage in sexually violent predatory criminal behavior*" as a "*substantial,* serious, and well-founded risk that the person will engage in such conduct if released into the community." (CALCRIM No. 3454, second italics added.)

[6] The disputed jury instruction that was given at Sweeney's commitment proceedings provided: "Under California's Welfare and Institutions Code Section 6500 the people must prove to you the following:

"1. [Sweeney] is mentally retarded[;]

"2. [Sweeney] presents a danger to herself or others; and

"3. [Sweeney] has a difficulty controlling her dangerous behavior[.]

"Welfare and Institutions Code Section 6500 also states: [¶] 'If a mentally retarded person is in the care or treatment of a state hospital, developmental center, or other facility at the time a petition for commitment is filed pursuant [to] this article, proof of a recent overt act while in the care and treatment of a state hospital, developmental center, or other facility is not required in order to find that the person is dangerous to self or others.' "

144 Cal.App.4th 841 [50 Cal.Rptr.3d 761] (*Bailie*), for the proposition that section 6500 must be construed as including an additional requirement of proof that a person's mental retardation is a substantial factor in causing him serious difficulty in controlling his dangerous behavior. (*Bailie*, at pp. 847–850.) We agree with Sweeney's argument.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [78 Cal.Rptr.3d 186].)

We briefly review the cases addressing the requirement that a link be shown between a person's dangerous behavior and the person's mental retardation, mental disorder, or mental illness.

**(9)** In *Kansas v. Hendricks* (1997) 521 U.S. 346, 350 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*), the court examined Kansas's civil commitment procedures for SVP's. The court noted that a "finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment"; however, civil commitment statutes have been sustained when they require proof of an additional factor such as mental illness or mental abnormality. (*Id.* at p. 358.) The court noted that Kansas's commitment statute "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." (*Ibid.*) The court remarked that the " 'mental abnormality' " factor served "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." (*Ibid.*) The court concluded that the statutory scheme complied with due process requirements. (*Id.* at p. 371.)

In *Kansas v. Crane* (2002) 534 U.S. 407, 409 [151 L.Ed.2d 856, 122 S.Ct. 867] (*Crane*), the court again examined Kansas's civil commitment procedures for SVP's. When analyzing *Hendricks* and the "lack of control" issue, the court noted that " 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior." (*Crane*, at p. 413.) In *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), our Supreme Court summarized *Crane* and *Hendricks*, and recognized that, in recent cases, both the United States and California Supreme Courts have "clarified that to be involuntarily civilly committed as a sexually violent predator, the person must, as a result of mental illness, have serious difficulty controlling his dangerous behavior." (*Howard N., supra,* 35 Cal.4th at p. 128.)

With this due process background, the *Howard N.* court reviewed the "extended detention scheme" of section 1800 et seq., which provided for the confinement of dangerous individuals who have been in the custody of the Division of Juvenile Facilities, and who suffer from a "mental or physical deficiency, disorder, or abnormality." (*Howard N., supra,* 35 Cal.4th at p. 131.) Specifically, the court examined whether section 1800 et seq. "violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling his dangerous behavior." (*Howard N.,* at p. 131.) Although *Crane* and *Hendricks* addressed SVP commitment schemes, the court found the cases instructive for the civil commitment of dangerous mentally ill people, because they embody "general due process principles regarding civil commitment." (*Howard N.,* at p. 131.) The court reasoned that there was "little analytical basis under these circumstances to stray from the due process requirements" set forth in *Crane* and *Hendricks.* (*Howard N.,* at p. 132.) The court concluded that due process required that "the extended detention scheme . . . contain a requirement of serious difficulty in controlling dangerous behavior." (*Ibid.*) The court "further conclude[d] that the extended detention scheme should be interpreted to contain a requirement of serious difficulty in controlling dangerous behavior" (*Ibid.*)

■■■ In *Bailie,* the case that Sweeney relies upon, the appellate court examined whether "section 6500 violates due process because it does not require proof that a person's mental retardation causes him or her to have serious difficulty in controlling dangerous behavior." (*Bailie, supra,* 144 Cal.App.4th at p. 847.) The reasoning of *Bailie* relies heavily on our Supreme Court's opinion in *Howard N.* (*Bailie,* at pp. 847–850.) The *Bailie* court concluded that the general due process principles discussed in *Howard N., Hendricks,* and *Crane* "apply to . . . section 6500 commitments as well." (*Bailie,* at p. 848.) Accordingly, *Bailie* held that section 6500 violated due process because it did not require proof that a person's retardation caused him to have serious difficulty in controlling his dangerous behavior. (*Bailie,* at p. 847.) *Bailie* concluded that, as in *Howard N.,* the Legislature would prefer to construe the section 6500 commitment scheme as including a causation requirement. (*Bailie,* at p. 850.)

The *Bailie* court went on to examine and distinguish the case of *People v. Quinn* (2001) 86 Cal.App.4th 1290, 1294–1295 [103 Cal.Rptr.2d 915]. *Quinn* was decided prior to *Howard N.,* and rejected the argument that section 6500 should be construed as including a causation requirement because a causation element "is not [in] the language of the statute," and it did not appear that the Legislature intended to include such a requirement. (*Quinn,* at pp. 1293–1294.) The *Bailie* court found the reasoning of *Quinn* to be unpersuasive in light of the reasoning in *Howard N.* (*Bailie, supra,* 144

Cal.App.4th at pp. 849–850.) We, too, do not find *Quinn* to be persuasive or controlling in light of *Howard N.* and *Bailie.*

In sum, we conclude the trial court erred by failing to instruct the jury that, in order to find Sweeney met the criteria of section 6500, it must have found Sweeney's mental retardation was a substantial factor in causing her serious difficulty in controlling her dangerous behavior.

The People assert that the trial court's instruction was not deficient because it informed the jury that it must find Sweeney had difficulty controlling her dangerous behavior, and *Howard N.* neither suggested nor ruled that a petitioner must prove that the person's mental disorder was the cause of the person's dangerous behavior. We disagree with this characterization of *Howard N.* The court framed the issue as: "whether the extended detention scheme violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling his dangerous behavior." (*Howard N., supra,* 35 Cal.4th at p. 131.) The court concluded that due process requires that "the extended detention scheme . . . contain a requirement of serious difficulty controlling dangerous behavior." (*Id.* at p. 132.) It can be inferred from the issue and the conclusion that it must be the person's mental deficiency, disorder, or abnormality that causes the serious difficulty in controlling dangerous behavior.

We decline to determine whether the trial court's error was harmless, because the order of commitment is moot. We have chosen to address the issues raised by Sweeney because they involve matters of public interest that are likely to reoccur yet normally evade review; however, there would be little value in a harmless error analysis.

### D. *Continuance*

Sweeney contends she was denied a fair hearing regarding her placement due to the trial court abusing its discretion by denying her request for a continuance. At oral argument, Sweeney agreed to withdraw this argument. In light of Sweeney's withdrawal, we do not address this contention.

### DISPOSITION

For the foregoing reasons, we conclude that (1) as to the underlying felony, it is for the jury, not the trial court, to determine whether the charge involves "death, great bodily injury, or an act which poses a serious threat of bodily harm to another person" (§ 6500); and (2) before a jury determines whether a person meets the criteria of section 6500, the trial court must instruct the jury

to find whether the person's mental retardation is a substantial factor in causing his or her serious difficulty in controlling his or her dangerous behavior. Nevertheless, because the commitment order has expired, we dismiss the appeal as moot.

Gaut, Acting P. J., and King, J., concurred.